**Certiorari Denied, No. 31,483, January 30, 2009**

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2009-NMCA-024**

**Filing Date:   December 9, 2008**

**Docket No. 27,048**

**STATE OF NEW MEXICO,**

> **Plaintiff-Appellee,**

**v.**

**PAUL VANCE,**

> **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TORRANCE COUNTY**
**Edmund H. Kase III, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Max Shepherd, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Vicki W. Zelle, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### OPINION

**CASTILLO, Judge.**

**{1}**     Defendant was convicted of trafficking methamphetamine by manufacture, distribution of a controlled substance, possession of drug precursors, and possession of drug

paraphernalia. He raises three issues on appeal, one of which is an issue of first impression in New Mexico: whether under the circumstances of this case, medicines such as pseudoephedrine cold tablets are excluded from the statutory definition of a "drug precursor" under the Drug Precursor Act (DPA), NMSA 1978, §§ 30-31B-1 to -18 (1989, as amended through 2004). We conclude that Section 30-31B-2(L) excludes the tablets that were in Defendant's possession, and we reverse Defendant's conviction for possession of drug precursors. We affirm the remaining convictions.

## I. BACKGROUND

**{2}** The charges in this case arose from a police officer's observations made during a visit to Defendant's home for the purpose of ensuring that Defendant was complying with court-ordered conditions of release in an unrelated matter. Defendant and two other individuals, both of whom testified at trial, were present. After entering the residence, the officer noticed a number of suspicious items, including a plate containing a white powdery substance and a razor blade, a hot plate, unused coffee filters, many batteries, and a bottle containing a hazy liquid. The white powdery substance field-tested positive for methamphetamine.

**{3}** Other officers arrived, and after a search warrant was obtained, the officers conducted a more thorough search and found various pipes, containers of unknown liquids, batteries, coffee filters, razor blades, light bulbs, HEET fuel line antifreeze, starting fluid, and twenty-two pseudoephedrine cold tablets still in their original packaging. Pseudoephedrine tablets can be used in manufacturing methamphetamine. Officers photographed the items found, which were subsequently disposed of pursuant to hazardous materials procedures. The finished methamphetamine was preserved.

**{4}** As discussed above, Defendant was convicted of trafficking methamphetamine by manufacture, distribution of a controlled substance (methamphetamine), possession of drug precursors, and possession of drug paraphernalia. Defendant appeals the verdict.

## II. DISCUSSION

**{5}** Defendant raises three issues on appeal: (1) whether he was improperly convicted of possession of drug precursors because medicines such as pseudoephedrine cold tablets are excluded from the statutory definition of drug precursor, (2) whether his convictions for trafficking by manufacture subsumes his convictions for possession of drug precursors and possession of drug paraphernalia such that conviction of all three offenses violates double jeopardy, and (3) whether the district court abused its discretion by permitting a PowerPoint presentation on methamphetamine manufacture that biased and confused the jury. We address each issue in turn.

### A. Possession of Drug Precursors

**{6}** Defendant asserts that he was improperly convicted of possession of drug precursors based on the twenty-two pseudoephedrine cold tablets in their original packaging found in his residence. The State argues that this issue was not preserved at trial. Defendant responds and contends that his actions did not constitute a crime as defined by the DPA and that his conviction on this count therefore constituted fundamental error. *See In re Gabriel M.*, 2002-NMCA-047, ¶¶ 9, 21, 132 N.M. 124, 45 P.3d 64 (reversing, as fundamental error, adjudication of arson because burning the personal property of another does not fall within the statutory definition of arson). "[I]f the evidence is insufficient to legally sustain one of the elements of a crime, the error is fundamental and may be raised for the first time on appeal." *State v. Scott*, 2008-NMCA-075, ¶ 4, 144 N.M. 231, 185 P.3d 1081. We thus review Defendant's conviction for fundamental error in order to determine whether the evidence was legally insufficient to satisfy an element of the crime of possession of drug precursors.

**{7}** "The starting point in every case involving the construction of a statute is an examination of the language utilized by [the Legislature] in drafting the pertinent statutory provisions." *State v. Johnson*, 2001-NMSC-001, ¶ 6, 130 N.M. 6, 15 P.3d 1233 (alteration in original) (internal quotation marks and citation omitted). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Id.* (internal quotation marks and citation omitted). The DPA provides that it "is unlawful for any person: . . . to manufacture, possess, transfer or transport a drug precursor without the appropriate license or in violation of any rule or regulation of the board." Section 30-31B-12(A)(8). A drug precursor is defined by the statute as a "substance, material, compound, mixture or preparation listed in Section 30-31B-3 . . . or regulations adopted thereto or any of their salts or isomers." Section 30-31B-2(L). Section 30-31B-3 includes pseudoephedrine among substances that are drug precursors. The DPA also "specifically excludes those substances, materials, compounds, mixtures or preparations [that] are prepared for dispensing pursuant to a prescription or over-the-counter distribution as a substance [that] is generally recognized as safe and effective within the meaning of the Federal Food, Drug and Cosmetic Act." Section 30-31B-2(L).

**{8}** The State argues that Sections 30-31B-3 and -2(L) appear to contradict each other and that attempting to reconcile them would lead to an absurd result not intended by the Legislature. We disagree. We see no absurdity in the Legislature's making it unlawful to possess pseudoephedrine without a license, while at the same time, exempting from this prohibition medications containing this ingredient.

**{9}** The State argues that pseudoephedrine cold tablets, when obtained for use as a drug precursor, are not "generally recognized as safe and effective within the meaning of the Federal Food, Drug and Cosmetic Act." Pseudoephedrine cold tablets, however, are prepared for dispensation as over-the-counter medications, as discussed below. Because these tablets are generally recognized as safe and effective at the time they are prepared for dispensing, what they are actually used for later is irrelevant for purposes of the statute. The

3

State's argument ignores the language in Section 30-31B-2(L) that specifies that the exclusion applies generally to "substances, materials, compounds, mixtures or preparations [that] are prepared for dispensing pursuant to a prescription or over-the-counter distribution." The statute neither limits the exclusion nor requires proof regarding the actual use of the medication before the exclusion is applicable.

**{10}** The State also contends that pseudoephedrine cold tablets are no longer an over-the-counter medication after the effective date of the Combat Methamphetamine Epidemic Act of 2005, which is a federal law requiring pharmacies to keep pseudoephedrine cold tablets and certain other medications behind the counter and to obtain identification and record the names of persons purchasing them. *See* 21 U.S.C. § 801 (2005). The State cites no authority for the proposition that these recent restrictions on the sale of pseudoephedrine cold tablets take them out of the commonly understood definition of an over-the-counter drug, which is a drug that may be sold without a prescription. *See, e.g.*, *Black's Law Dictionary* 1137 (8th ed. 2004) (defining "over-the-counter" as "sold legally without a doctor's prescription").

**{11}** Accordingly, we reverse Defendant's conviction for possession of drug precursors because Section 30-31B-2(L) specifically excludes over-the-counter pseudoephedrine cold tablets of the type in Defendant's possession.

## B. Double Jeopardy

**{12}** We first note that our reversal of Defendant's conviction for possession of drug precursors disposes of his double jeopardy challenge as to that charge. Defendant also asserts that his convictions for trafficking by manufacture (methamphetamine) and possession of drug paraphernalia violate double jeopardy. "The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment." NMSA 1978, § 30-1-10 (1963); *State v. Lucero*, 1999-NMCA-102, ¶ 18, 127 N.M. 672, 986 P.2d 468. This is a "double description" case, in which "the defendant is charged with violations of multiple statutes that may or may not be deemed the same offense for double jeopardy purposes." *Swafford v. State*, 112 N.M. 3, 8, 810 P.2d 1223, 1228 (1991). Where a defendant alleges a double jeopardy violation based on multiple punishments for the same conduct, the issue is a question of legislative intent that we review de novo. *State v. Franco*, 2005-NMSC-013, ¶ 5, 137 N.M. 447, 112 P.3d 1104.

**{13}** *Swafford* set forth the test for double jeopardy violations in double-description cases:

> Under the first part of the analysis, . . . the task is merely to determine whether the conduct for which there are multiple charges is discrete (unitary) or distinguishable. If it reasonably can be said that the conduct is unitary, then one must move to the second part of the inquiry. Otherwise, if the conduct is separate and distinct, inquiry is at an end.

4

112 N.M. at 14, 810 P.2d at 1234. In determining whether a defendant's conduct was unitary, we consider such factors as proximity in time and space, similarities, the sequencing of the acts, intervening events, and the defendant's goals for and mental state during each act. *Franco*, 2005-NMSC-013, ¶ 7. "The proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Id.* (internal quotation marks and citation omitted). We therefore first review the elements of the charged offenses and then consider whether the State presented sufficient facts at trial in order to support the elements of both crimes.

**{14}** Defendant was charged with trafficking a controlled substance contrary to NMSA 1978, Section 30-31-20 (2006). In order to prove that charge, the State was required to show that Defendant intentionally manufactured methamphetamine. Section 30-31-20(A)(1), (B). Defendant was also charged with possession of drug paraphernalia, which requires proof that Defendant used or had intent to use drug paraphernalia "to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance." NMSA 1978, § 30-31-25.1(A) (2001). Defendant's primary contention is that the jury used the same evidence to convict him of possession of the drug paraphernalia and of manufacturing methamphetamine.

**{15}** We now turn to the evidence presented at trial. Three witnesses, Chief Jimmy Chavez, Officer Dominic Smith, and Sergeant Clarence Gibson, testified as to what they saw at the scene. These witnesses observed items including a pyrex bong, light bulbs, plastic straws, razor blades, and plates. The light bulbs were altered in a manner typically associated with smoking methamphetamine, and the straws were cut in a manner commonly used for snorting methamphetamine. Smith explained that razor blades are typically used to cut or crush methamphetamine crystals so that they can be smoked or inhaled. In addition to these observations, two other witnesses testified that they actually consumed methamphetamine with Defendant before the police arrived.

**{16}** Chavez, Smith, and Gibson also testified that they observed items that are known to be used for the manufacture of methamphetamine. In Defendant's house were large quantities of batteries and coffee filters, a grinder with white powdery residue, glass containers holding bi-layer liquids, fuel antifreeze, starter fluid, and taped rubber tubing. Batteries are commonly dismantled and mixed with ephedrine during the manufacture of methamphetamine, and grinders are used to crush ephedrine pills. Smith specifically testified that the other listed items are often found in conjunction with the manufacture of methamphetamine. Further, Gibson noticed that there were "several reactions in the process of manufacturing in the residence."

**{17}** Based on this evidence, we conclude that there were two types of items in Defendant's residence. Some of the items could be used to manufacture methamphetamine, and those items support the trafficking charge. Other items could be used to consume methamphetamine and marijuana, and those items support the paraphernalia charge. The

5

items used to consume drugs were not necessary to manufacture methamphetamine, and they supply the basis for conduct distinguishable from the conduct involved in manufacturing methamphetamine. Defendant's conduct, possessing drug paraphernalia related to personal consumption and possessing items used specifically to manufacture methamphetamine, is therefore sufficiently distinct. *See Franco*, 2005-NMSC-013, ¶ 7. We thus conclude that Defendant's conduct was not unitary and that "the jury reasonably could have inferred independent factual bases for the charged offenses." *Id.* (internal quotation marks and citation omitted). Because Defendant's conduct was not unitary, we conclude under the first *Swafford* inquiry that double jeopardy principles were not violated. *See State v. Saiz*, 2008-NMSC-048, ¶ 35, 144 N.M. 663, 191 P.3d 521.

## C. PowerPoint Presentation

**{18}** Defendant argues that the district court abused its discretion by allowing a witness to testify using a PowerPoint presentation describing the manufacture of methamphetamine. Defendant contends that (1) the presentation was irrelevant because he was not charged with using the manufacturing method that was described and (2) the testimony accompanying the presentation used inflammatory or derogatory terms such as the "Nazi Dope Method" of manufacture and "Beavis and Butthead" methamphetamine cooks.

> We review the district court's decision to admit evidence under an abuse of discretion standard. An abuse of discretion relating to the admission of evidence is measured by whether the district court's ruling was clearly untenable or not justified by reason, and by whether the ruling was clearly against the logic and effect of the facts and circumstances of the case.

*State v. Garcia*, 2005-NMCA-042, ¶ 38, 137 N.M. 315, 110 P.3d 531 (internal quotation marks and citations omitted).

**{19}** The PowerPoint presentation was demonstrative evidence. "New Mexico cases define demonstrative evidence, also sometimes referred to as real evidence or evidence by inspection, as such evidence as is addressed directly to the senses of the court or jury without the intervention of the testimony of witnesses, as where various things are exhibited in open court." *State v. Tollardo*, 2003-NMCA-122, ¶ 10, 134 N.M. 430, 77 P.3d 1023 (internal quotation marks and citation omitted). "Diagrams and exhibits to illustrate testimony are admissible so long as they are not misleading." *Zemke v. Zemke*, 116 N.M. 114, 122, 860 P.2d 756, 764 (Ct. App. 1993).

**{20}** The first part of Defendant's argument is that the inclusion in the PowerPoint presentation of the manufacturing step involving anyhdrous ammonia was error because no anyhdrous ammonia was found in Defendant's residence. In narrating the PowerPoint presentation, Gibson testified as follows:

> We're going to put our metals inside with our ephedrine powder, and

6

now we're going to run out of town, and we're going to go to a farm, and we're going to steal some anhydrous ammonia. Once we get our anhydrous, bring it back in a proper container, we're going to add it to the mixture, and it's going to dissolve that metal, which is going to give us our pure meth base.

On cross-examination, Gibson acknowledged that no anhydrous ammonia was found in Defendant's residence. On redirect examination, Gibson testified that it was not necessary to have anhydrous ammonia to manufacture methamphetamine. He further testified that "[d]ue to the overwhelming smell and the dangers of anhydrous ammonia, we found it a practice that that stage or process of the manufacturing for methamphetamine is done in an outside area, say out in the county."

**{21}**     The PowerPoint presentation was used as context for Gibson's subsequent testimony regarding photographs of the actual items found in Defendant's residence. It would have been confusing to the jury if the depiction of the manufacturing process cut off before the final steps, which would have included the use of anyhdrous ammonia. We see no abuse of discretion in the district court's permitting the entire manufacturing process to be described as context for the items found.

**{22}**     We now address Defendant's second point regarding any prejudice that might have stemmed from the language used in the presentation. Gibson, who had been accepted as an expert in detection and recognition of methamphetamine laboratories, introduced the PowerPoint presentation with the following testimony:

> The slide show that I'm going to present to you is going to be the basic chemical makeup and manufacturing process of methamphetamine via the Birch method, or as we know it more commonly, the Nazi method. They call it [the] Nazi dope method.

Later, Gibson testified:

> You have two different types of cooks. You have your chemist cooks, [who] have a lot of knowledge, a lot of knowledge in chemistry, a lot of knowledge in glassware, appropriate beakers, things to use, then you have what they know as a Beavis and Butthead cook. This is a person that learns how to cook from other meth cooks. He reads it off the internet and uses any household items that he can bring forth to manufacture his methamphetamine.

**{23}**     Defendant does not argue that the terms in question are not actually used in connection with methamphetamine manufacture. Although terminology referring to Nazis and Beavis and Butthead may carry negative connotations, these terms were not used specifically in reference to Defendant. Gibson used the terms to make distinctions between

the specific process depicted in his presentation and other processes, and between methamphetamine manufacturers who have some expertise in chemistry and those who do not. In these circumstances, we conclude that use of the terms in question did not prejudice Defendant, and no abuse of discretion occurred.

## III.  CONCLUSION

{24}   For the reasons set forth above, we reverse Defendant's conviction for possession of drug precursors and affirm his convictions for trafficking methamphetamine by manufacture and possession of drug paraphernalia. We remand the case to the district court for resentencing.

{25}   **IT IS SO ORDERED.**

 

 
_____

**CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

 

 
_____

**JAMES J. WECHSLER, Judge**

 

 
_____

**RODERICK T. KENNEDY, Judge**

 

Topic Index for *State v. Vance,* No. 27,048

| | |
|---|---|
| **AE** | **Appeal and Error** |
| AE-FE | Fundamental Error |
| | |
| **CL** | **Criminal Law** |
| CL-CL | Controlled Substances |
| | |
| **CP** | **Criminal Procedure** |
| CP-DJ | Double Jeopardy |
| | |
| **EV** | **Evidence** |
| EV-DM | Demonstrative Evidence |
| EV-PJ | Prejudicial Evidence |
| | |
| **ST** | **Statutes** |
| ST-CS | Conflicting Statutes |

ST-IP          Interpretation
ST-LI          Legislative Intent