VIGIL, Judge (specially concurring). {49} I agree with the majority that the district court did not abuse its discretion in excluding the proposed expert testimony of Dr. Koury and Dr. Dahlgren. However, I follow a fundamentally different analytical approach in considering the admissibility of this proposed expert testimony. {50} The Daubert-Alberico factors are considered in relation to whether the methodology used by an expert to arrive at a conclusion is scientifically valid. Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786 (stating that a proffer of scientific testimony entails a “preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue”); Downey, 2008-NMSC-061, ¶ 30, 145 N.M. 232, 195 P.3d 1244 (stating that for scientific evidence to be admissible under Rule 11-702, the reasoning or methodology underlying the testimony must be scientifically valid). However, in its consideration of whether the doctors were qualified to testify, the majority undertakes consideration of the Daubert-Alberico factors. Majority Op. ¶¶ 20-24, 32-35. This is not only unnecessary, it causes confusion. {51} The Daubert-Alberico factors are considered only after the trial court has first determined that the proposed expert is qualified and that the proposed testimony will be helpful in deciding an issue of fact in the case. Neither of these two preliminary questions requires an analysis of the Daubert-Alberico factors. The trial court then determines if the proposed testimony involves scientific evidence. If the proposed testimony involves scientific evidence, the trial court then considers the Daubert-Alberico factors to determine if the methodology utilized by the expert is scientifically valid. If the proposed testimony does not involve scientific evidence, the Daubertr-Alberico factors are not applicable. {52} My second major disagreement with the majority is its analysis of whether a differential diagnosis performed by a qualified doctor may constitute sufficient proof of causation in a toxic tort case. Courts disagree on whether a doctor relying on a clinical differential diagnosis “can provide adequate proof of causation in a toxic tort action.” Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1210 (10th Cir.2002) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence, Supreme Court’s Trilogy on the Admissibility of Expert Testimony, 34 (2d ed. 2000)). The result of the majority opinion discussion of this issue at ¶¶ 20-24 and its reliance on McClain is to exclude a doctor from ever being able to use a differential diagnosis to establish causation in a toxic tort case. Not only do I disagree with such a sweeping conclusion, it is unnecessary. The admissibility of evidence is specific to each case, and we should only determine whether the district court abused its discretion in excluding the diagnoses in this case. See Hollander, 289 F.3d at 1210. DISCUSSION New Mexico Law Regarding the Admission of Expert Testimony {53} The admission of all expert testimony is governed by Rule 11-702. Rule 11-702 is entitled, “Testimony by experts,” and it provides: If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. {54} It is now settled that under Rule 11-702 there are three prerequisites for the admission of all expert opinion testimony: “(1) experts must be qualified; (2) their testimony must assist the trier of fact; and (3) their testimony must be limited to the area of scientific, technical, or other specialized knowledge in which they are qualified.” Torres, 1999-NMSC-010, ¶ 23, 127 N.M. 20, 976 P.2d 20. The burden is on the proponent of the testimony to satisfy each of the prerequisites before the expert evidence is admissible. State v. Downey, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244 (stating that Rule 11-702 predicates the admissibility of expert testimony on the satisfaction of the three requirements); State v. Morales, 2002-NMCA-052, ¶ 21, 132 N.M. 146, 45 P.3d 406 (stating that expert testimony may be admitted under Rule 11-702 if the proponent establishes these three prerequisites). I now discuss these prerequisites. {55} First, “Regardless of whether the subject matter involves scientific, technical, or other specialized knowledge, however, a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible.” Torres, 1999-NMSC-010, ¶ 45, 127 N.M. 20, 976 P.2d 20; see Downey, 2008-NMSC-061, ¶ 26, 145 N.M. 232, 195 P.3d 1244 (quoting Torres, 1999-NMSC-010, ¶ 45, 127 N.M. 20, 976 P.2d 20). The trial court’s determination is reviewed for an abuse of discretion. See Torres, 1999-NMSC-010, ¶ 40, 127 N.M. 20, 976 P.2d 20 (concluding that the evidence failed to establish that a police officer was qualified to testify about the scientific bases of horizontal gaze nystagmus (HGN) testing); State v. Stills, 1998-NMSC-009, ¶ 34, 125 N.M. 66, 957 P.2d 51 (examining the evidence and concluding it supported a finding that the witness was an expert); State v. Lasworth, 2002-NMCA-029, ¶ 17, 131 N.M. 739, 42 P.3d 844 (noting that the state contended the trial court abused its discretion by ruling its witness was not qualified as an expert). {56} If the witness is qualified, the second condition for the admission of expert evidence must be satisfied. This requirement, that the testimony must assist the trier of fact, is primarily one of relevance. Anderson, 118 N.M. at 291, 881 P.2d at 36. “One aspect of relevance is whether expert testimony proffered in the ease is sufficiently tied to the facts of the ease that it will aid the jury in resolving a factual dispute.” Downey, 2008-NMSC-061, ¶ 30, 145 N.M. 232, 195 P.3d 1244 (internal quotation marks and citation omitted). In addition, if the witness cannot explain how the testimony proves an issue in the case, it does not assist the trier of fact. See Torres, 1999-NMSC-010, ¶ 40, 127 N.M. 20, 976 P.2d 20 (concluding that since the testimony of a police officer did not explain how a horizontal gaze nystagmus (HGN) test proved intoxication, his testimony concerning the test did not assist the trier of fact); Rule 11^401 (defining “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence”). {57} The third requirement for the admission of expert testimony has received the most attention. In Alberico, 116 N.M. at 165-68, 861 P.2d at 201-04, our Supreme Court abandoned the “general acceptance” test of Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), in favor of the more flexible Daubert test for determining if expert opinion evidence involving “scientific knowledge” is reliable and therefore admissible under Rule 11-702. See also State v. Tollardo, 2003-NMCA-122, 1117, 134 N.M. 430, 77 P.3d 1023 (stating that Alberico adopted “a more flexible inquiry” in which the general acceptance of the theory or technique is considered but is not controlling). In determining whether to admit expert opinion involving “scientific knowledge,” the trial court considers a nonexclusive list of factors adopted from Daubert which include: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique’s operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field. Anderson, 118 N.M. at 291, 881 P.2d at 36 (internal quotation marks and citation omitted). In Alberico, 116 N.M. at 167, 861 P.2d at 203, our Supreme Court added another factor: (5) “whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture.” See Anderson, 118 N.M. at 291, 881 P.2d at 36 (noting the addition of this requirement by Alberico). The trial court’s application of the Dauberb-Alberico factors is reviewed for abuse of discretion. Tollardo, 2003-NMCA-122, ¶ 16, 134 N.M. 430, 77 P.3d 1023. {58} However, the Daubertr-Alberico factors apply only when the trial court is evaluating scientific testimony; they do not apply when evaluating non-scientific testimony. Torres, 1999-NMSC-010, ¶ 43, 127 N.M. 20, 976 P.2d 20; State v. Aleman, 2008-NMCA-137, ¶ 6, 145 N.M. 79, 194 P.3d 110. The initial question of whether the expert opinion involves scientific knowledge, which must meet the standard of evidentiary reliability set forth in Daubert-Alberico presents a question of law which is reviewed de novo. Torres, 1999-NMSC-010, ¶ 28, 127 N.M. 20, 976 P.2d 20; Aleman, 2008-NMCA-137, ¶ 6, 145 N.M. 79, 194 P.3d 110; Tollardo, 2003-NMCA-122, ¶ 9, 134 N.M. 430, 77 P.3d 1023; Morales, 2002-NMCA-052, ¶ 18, 132 N.M. 146, 45 P.3d 406. {59} Summarizing: (1) The proponent of any expert evidence must first establish that the proposed witness is qualified to give an expert opinion in the relevant field. This determination lies in the discretion of the trial court. If the witness is not qualified, the inquiry ends, and the evidence is not admissible. (2) If the witness is qualified as an expert, the proponent of the evidence must demonstrate that the testimony will assist the trier of fact. Again, this determination lies in the discretion of the trial court, and its determination will depend on a myriad of factors, including the nature of the case, and the purpose for which the evidence is being offered. (3) If the first two requirements are satisfied, the trial court must then determine whether the proposed testimony involves scientific evidence. This is an issue of law, reviewed de novo on appeal. The trial court applies the Daubert-Alberico factors to assess whether the proposed testimony is reliable and therefore admissible if it determines that the testimony involves scientific evidence. The Daubert-Alberico factors do not apply if the expert testimony is nonscientific and is based on the knowledge, experience, or training of the witness. To some degree, these considerations and the showing required to satisfy them may overlap. However, to the extent possible, consideration should be given to each separate prerequisite on its own. This will simplify and focus any pretrial hearing which may be held to consider the admissibility of expert testimony and appellate review of the trial court’s decision. {60} When all the factors are considered, the admission of expert testimony is within the discretion of the trial court and will not be reversed absent a showing of abuse of that discretion. Alberico, 116 N.M. at 169, 861 P.2d at 205. “An abuse of discretion standard of review, however, is not tantamount to rubber-stamping the trial judge’s decision. It should not prevent an appellate court from conducting a meaningful analysis of the admission [of] scientific testimony to ensure that the trial judge’s decision was in accordance with the Rules of Evidence and the evidence in the case.” Id. at 170, 861 P.2d at 206; see Downey, 2008-NMSC-061, ¶ 24, 145 N.M. 232, 195 P.3d 1244 (repeating this observation of Alberico). Moreover, in light of the liberal approach of our rules of evidence to the admission of evidence and the heightened qualifications of modern day jurors, any doubt regarding the admissibility of expert opinion evidence “should be resolved in favor of admission, rather than exclusion.” Lee v. Martinez, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291 (citing 1 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence xix (2d ed.2003)); see Aleman, 2008-NMCA-137, ¶ 30, 145 N.M. 79, 194 P.3d 110. {61} I now apply the foregoing analysis to consider whether the district court abused its discretion in this case when it ruled that the testimony of the Parkhills’ experts was not admissible. Qualifications of the Experts {62} The foundation for determining whether the expert is qualified is to identify what the issue is that requires expert testimony. This insures that an accurate determination can then be made by the trial court that the witness has the requisite knowledge, skill, experience, training, or education to qualify as an expert in the relevant field. {63} The central issue in this case is whether the monensin in the horse feed caused the Parkhills’ adverse physical symptoms. On the record before the district court, it was demonstrated that the most relevant field of expertise which applies in resolving this disputed fact is toxicology. “The science of toxicology attempts to determine at what doses foreign agents [monensin in horse feed] produce their effects [of adverse physical symptoms in the Parkhills].” Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Toxicology, 403 (2d ed. 2000). Stated in legal terms, this is a classic toxic tort case. “Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs’ burden in a toxic tort case.” Allen v. Pa. Eng’g Corp., 102 F.3d 194, 199 (5th Cir.1996). {64} The Parkhills sought to introduce the opinion of Dr. Koury, their treating physician, that the monensin in the horse feed caused their physical symptoms. The district court made findings of fact that Dr. Koury is a family practice doctor who provided the services of a family practitioner to the Parkhills, which included a diagnosis of their conditions and treatment. On the other hand, the district court also found that Dr. Koury is not, and has never been, trained as a toxicologist; he knew nothing about monensin prior to this litigation; he did not estimate any dose of monensin to which the Parkhills were exposed; and he did not estimate the duration of the Parkhills’ claimed exposure to monensin. {65} The district court concluded that “Dr. Koury lacks the background, training and experience required to render a reliable opinion on the subject whether monensin was the external cause or etiology of the [Parkhills’] medical symptoms.” These findings are not challenged, and they are supported by the evidence presented to the district court. I therefore conclude that the district court did not abuse its discretion in determining that Dr. Koury was not qualified under Rule 11-702. {66} The Parkhills also sought to introduce testimony from Dr. Dahlgren, whom they hired to testify as an expert on causation. Dr. Dahlgren is board-certified in internal medicine, and the Parkhills asserted his medical specialty is “assessing and diagnosing toxic exposures in the environment[.]” However, Dr. Dahlgren had no idea how much monensin the Parkhills were exposed to, and he made no attempt to calculate the dose. Moreover, Dr. Dahlgren never heard of monensin before this case; knew nothing about livestock feeding practices or the widespread use of monensin in livestock feed; had never studied the class of antibiotics (ionophores) involved in this dispute before he was hired in this lawsuit; never met, spoke to, or examined the Parkhills; and acknowledged he developed his opinions regarding toxicity solely for purposes of this litigation. {67} The district court found that it did not appear from the evidence that Dr. Dahlgren had any specialized education in toxicology, that “his qualifications are less than stellar,” and concluded that he was not qualified to testify as an expert. In light of the evidence presented to the district court, I cannot conclude that the district court abused its discretion in finding that Dr. Dahlgren was not qualified to render an opinion on causation in this case. Expert Testimony Must Assist the Trier of Fact {68} The Parkhills nevertheless argue that Dr. Koury and Dr. Dahlgren are medical doctors who are qualified to perform a differential diagnosis. Since the opinions of the doctors are based on the differential diagnosis they performed, the Parkhills assert that they were qualified to testify that monensin in the horse feed caused their adverse physical symptoms. I assume that a doctor’s experience or training qualifies the doctor to perform a differential diagnosis and therefore proceed to an analysis of whether the Parkhills satisfied the second requirement for the admission of expert testimony under Rule 11-702. {69} A “differential diagnosis refers to the process by which a physician rules in all scientifically plausible causes of the plaintiffs injury. The physician then rules out the least plausible causes of injury until the most likely cause remains. The remaining cause is the expert’s conclusion.” Hollander, 289 F.3d at 1209 (emphasis added) (alterations omitted) (internal quotation marks and citation omitted); see Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Medical Testimony, 481 (2d ed. 2000) (defining a differential diagnosis as “[t]he term used by physicians to refer to the process of determining which of two or more diseases with similar symptoms and signs the patient is suffering from, by means of comparing the various competing diagnostic hypotheses with the clinical findings”). {70} To establish cause in a toxic tort case with a differential diagnosis, the evidence must show both “general causation” and “specific causation.” See Norris v. Baxter Healthcare Corp., 397 F.3d 878, 881 (10th Cir.2005) (citing Raynor v. Merrell Pharms., Inc., 104 F.3d 1371, 1376 (D.C.Cir.1997) (discussing causation in toxic tort cases in terms of general causation and specific causation)). “General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual’s injury.” Id. at 881; see also Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Medical Testimony, 481, 483 (stating that “[gjeneral causation is established by demonstrating (usually by reference to a scientific publication) that exposure to the substance in question causes (or is capable of causing) disease” and that “[sjpecific, or individual, causation is established by demonstrating that a given exposure is the cause of an individual’s disease”). A differential diagnosis to establish causation in a toxic tort ease therefore necessarily assumes that the “final, suspected cause remaining after the process of elimination must actually be capable of causing the injury” or disease. See Norris, 397 F.3d at 885 (emphasis omitted) (quoting Hall v. Baxter Healthcare Corp., 947 F.Supp. 1387, 1413 (D.Or.1996)) (quoting Cavallo v. Star Enter., 892 F.Supp. 756, 771 (E.D.Va.1995)), ajfd on this ground, rev’d on other grounds, 100 F.3d 1150 (4th Cir.1996). Thus, where the evidence fails to establish that the suspected cause is actually capable of causing the injury or disease (general causation), a differential diagnosis cannot reliably point to the suspected cause as the actual cause (specific causation). In the language of Rule 11-702, this results in an unreliable opinion that does not assist the trier of fact, and it is not admissible. See Downey, 2008-NMSC-061, ¶¶ 30, 32, 145 N.M. 232, 195 P.3d 1244 (reiterating that expert testimony is inadmissible under Rule 11-702 unless it will assist the trier of fact, and that expert testimony which is “mere conjecture” is inadmissible (internal quotation marks and citation omitted)). {71} I now turn to the specific facts of this case. The district court made specific findings that Dr. Koury did not perform adequate research to reliably determine that monensin generally is, to a reasonable medical probability, capable of causing the varied symptoms observed in the Parkhills in the human population as a whole. “No such research has been presented to the Court.” Instead, the district court found that Dr. Koury presumed general causation, and “Dr. Koury has no reliable scientific basis for that presumption.” These findings have support in the evidence presented to the district court and are not specifically challenged. {72} Dr. Dahlgren testified he was aware from the reports and testimony of other experts that monensin has been routinely used for many years as an additive in cattle and chicken feed in concentrations up to fifty times greater than the concentrations contained in the horse feed in the present case; however, Dr. Dahlgren stated that he had not researched what protective equipment, if any, was used within the industry when dealing with these feeds or whether there had been a single incident of health problems with workers in the industry. Dr. Dahlgren was also unaware that other people who had fed the monensin-contaminated feed (those feeding at the Dexter locations) had not experienced any adverse health symptoms. In addition, the district court was presented with evidence that the Parkhills’ own veterinary toxicologist stated that in his nearly fifty years of experience as a veterinary toxicologist, and despite monensin’s wide-spread use for more than thirty years in livestock feeding operations throughout the world, “I’ve never known a human that’s been affected.” {73} In light of the foregoing evidence, I conclude it was well within the discretion of the district court to conclude that the differential diagnoses of Drs. Koury and Dahlgren were not sufficiently reliable because they were lacking in the necessary foundation of general causation. See Hollander, 289 F.3d at 1210-11 (concluding that differential diagnosis expert testimony of a causal connection between a prescription drug (Parlodel) and the plaintiffs stroke was inadmissible because the trial court did not abuse its discretion in concluding the experts failed to demonstrate by reliable evidence that the drug can cause strokes); Norris, 397 F.3d at 885-86 (holding that experts’ differential diagnoses that were contrary to all available epidemiological evidence that silicone breast implants did not cause diseases at issue were not admissible); Raynor, 104 F.3d at 1375-76 (holding that differential diagnosis which concluded that Bendectine caused the child’s birth defects was inadmissible because a link between Bendectine and birth defects (general causation) was missing). {74} In contrast to the case before us, in Ambrosini v. Labarraque, 101 F.3d 129, 135-36 (D.C.Cir.1996), the court held that a differential diagnosis opinion was admissible to defeat summary judgment in a case where the plaintiffs alleged that the prescription drug Depo-Provera caused a child’s birth defects. The plaintiffs presented expert testimony from an epidemiologist that the drug could cause birth defects like the child’s (general causation) and testimony from an expert on birth defects that the drug caused the child’s birth defects (specific causation). The court concluded that in light of this evidence, the experts’ testimony would assist the trier of fact to understand the evidence or determine a fact in issue. Id. In the case before us, however, the differential diagnoses of Drs. Koury and Dahlgren lack reliability and, therefore, would not assist the trier of fact. The consequence is that their opinions are inadmissible. {75} The Parkhills argue this case presents “unique circumstances” and therefore general causation is not required. I agree that the evidence may demonstrate to the trial court that there are unique circumstances that make a presentation of evidence of general causation unnecessary or impossible. See Hollander, 289 F.3d at 1211-12 (stating that a medical expert must not always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness where the first several victims of a new toxic tort are involved “simply because the medical literature, which will eventually show the connection between the victims’ condition and the toxic substance, has not yet been completed”) (quoting Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1209 (8th Cir.2000)); Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir.1999) (stating that a medical expert is not always required to cite published studies on general causation because this “would doom from the outset all cases in which the state of research on the specific ailment or on the alleged causal agent was in its early stages”; but emphasizing that the diagnosis must otherwise be trustworthy); Ambrosini, 101 F.3d at 138 (stating “the fact that a case may be the first of its type, or that the plaintiffs doctors may have been the first alert enough to recognize a causal connection,” does not render an expert’s opinion inadmissible and that when an expert is “concededly well qualified” in the field and “when the underlying basis or methods of an expert’s opinions are of a type reasonably relied upon by the experts in the field, the court must allow the opinion to be assessed by the factfinder”) (alteration omitted) (internal quotation marks and citations omitted). In addition, I note Rubanick v. Witco Chem. Corp., 125 N.J. 421, 593 A.2d 733, 747-48 (1991), in which the New Jersey Supreme Court undertook a general analysis of cases addressing causation in toxic tort cases and concluded: [W]e hold that in toxic-tort litigation, a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field. The evidence of such scientific knowledge must be proffered by an expert who is sufficiently qualified by education, knowledge, training, and experience in the specific field of science. The expert must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached. However, I agree with Defendant that the Parkhills failed to demonstrate to the district court that such unique circumstances exist in this case to conclude that the district court abused its discretion in excluding the opinions of Drs. Koury and Dahlgren. CONCLUSION {76} For the foregoing reasons, I agree with the majority that the district court did not abuse its discretion by excluding Plaintiffs proffered expert testimony in this case. I also agree with the majority that Banks does not apply in considering the admissibility of the Parkhills’ expert testimony. Majority Op. ¶ 23. However, because the majority undertakes a fundamentally different analysis in considering the admissibility of the proposed expert testimony, and the majority analysis goes too far by excluding differential diagnosis testimony to establish cause in all toxic tort cases, I specially concur.