Certiorari Denied, August 10, 2017, No. S-1-SC-36561

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2017-NMCA-066**

**Filing Date: June 14, 2017**

**Docket No. A-1-CA-35348**

**TOWN OF TAOS,**

> **Plaintiff-Appellee,**

**v.**

**EDWIN WISDOM,**

> **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Sarah C. Backus, District Judge**

D. Eric Hannum
Albuquerque, NM

for Appellee

Ben A. Ortega
Albuquerque, NM

for Appellant

## OPINION

**VARGAS, Judge.**

**{1}** Defendant, Edwin Wisdom, was convicted in district court of driving under the influence, contrary to Taos, N.M., Uniform Traffic Ordinance, art. VI § 12-6-12.1(B)(1) (2010). On appeal, he challenges the admissibility of his breath alcohol test results (BAT), the admission of an officer's testimony regarding the administration of and Defendant's performance on standardized field sobriety tests, and the sufficiency of the evidence to support a conviction. We affirm the district court.

1

## I. BACKGROUND

**{2}** Officer Luke Martinez was summoned to the scene of a vehicle accident on the evening of February 13, 2015. When he arrived at the scene, Defendant, who was involved in the accident, provided his identification to Officer Martinez. Officer Martinez continued to check everyone involved for injuries and conduct a crash investigation. When he returned to Defendant for his statement a few minutes later, he noticed a strong odor of alcohol on Defendant's breath. Defendant admitted to having "a few beers." Officer Martinez had Defendant perform three standardized field sobriety tests—the horizontal gaze nystagmus (HGN) test, the walk-and-turn test, and the one-leg-stand test. Officer Martinez then took Defendant into custody.

**{3}** Defendant submitted to a breath alcohol test. The first two times Officer Martinez ran the Intoxilyzer 8000 breath test machine (the machine), the machine indicated that the calibration was "out of tolerance." After a key operator inspected the machine, Officer Martinez again ran the test on Defendant. This time, the test rendered two readings of 0.12 each.

**{4}** Defendant was found guilty in municipal court of driving under the influence, contrary to Taos, N.M., Uniform Traffic Ordinance § 12-6-12.1(B)(1), making it illegal for a person to drive with an "alcohol concentration of eight one-hundredths or more in the person's blood or breath within three hours of driving the vehicle" where "the alcohol concentration results from alcohol consumed before or while driving the vehicle[.]" Defendant appealed to the district court. After a bench trial, the district court found Defendant guilty, and Defendant appealed.

## II. DISCUSSION

**{5}** Defendant makes three assertions of error. First, he contends that evidence of Defendant's blood alcohol content (BAC) was both inadmissible and of no evidentiary value because Plaintiff, Town of Taos (the Town), failed to run radio frequency interference tests and because the evidence presented at trial suggests the solution used to calibrate the machine was used at an incorrect temperature. Second, Defendant argues that the district court improperly considered the arresting officer's testimony regarding Defendant's performance on field sobriety tests as expert testimony. Finally, Defendant claims that there is insufficient evidence to support his conviction, alleging an insufficient nexus between driving and impairment from alcohol consumption.

### A. Admission of BAC Results

**{6}** "We review a [district] court's admission of evidence for an abuse of discretion." *State v. Montoya*, 2016-NMCA-079, ¶ 10, 382 P.3d 948. An abuse of discretion is that which is "erroneous, arbitrary, or unwarranted." *Id.* (alteration, internal quotation marks, and citation omitted). "The [district] court abuses its discretion when it admits evidence for

which the necessary foundation has not been laid." *State v. Onsurez*, 2002-NMCA-082, ¶ 8, 132 N.M. 485, 51 P.3d 528. To the extent that Defendant's arguments require interpretation of an administrative regulation, we apply a de novo review, using the same rules we use to interpret statutes. *State v. Hobbs*, 2016-NMCA-022, ¶ 9, 366 P.3d 304, *cert. denied*, 2016-NMCERT-002, 370 P.3d 1212. "The principal command of statutory construction is that the court should determine and effectuate the intent of the Legislature, using the plain language of the statute as the primary indicator of legislative intent." *Id.* (alteration, internal quotation marks, and citation omitted).

**{7}** The New Mexico Implied Consent Act authorizes a law enforcement officer to administer a blood and/or breath test where the officer has "reasonable grounds to believe" a person is driving a motor vehicle in this state while under the influence of alcohol. NMSA 1978, § 66-8-107(B) (1993). All laboratories analyzing breath and blood samples pursuant to the Implied Consent Act must be certified by the Scientific Laboratory Division of the Department of Health (SLD). NMSA 1978, § 24-1-22(C) (2003).

**{8}** The Legislature has delegated authority to SLD to "promulgate and approve satisfactory techniques or methods to test persons believed to be operating a motor vehicle or motorboat under the influence of drugs or alcohol[.]" Section 24-1-22(A); *see* § 66-8-107 (requiring persons operating a motor vehicle in the state to consent to chemical tests approved by SLD, of breath, blood, or both). SLD has the authority to issue certifications for test operators and their instructors and to "establish or approve quality control measures for alcohol breath testing[.]" Section 24-1-22(A). SLD also has the task of establishing "criteria and specifications for equipment, training, quality control, testing methodology, blood-breath relationships and the certification of operators, instructors and collectors of breath samples." Section 24-1-22(B). SLD certification is granted according to the rules and regulations created by SLD, and is subject to termination or revocation for cause. Section 24-1-22(C). Pursuant to this directive, SLD promulgated Regulation 7.33.2 NMAC (3/14/2001, as amended through 4/30/2010) to regulate blood and breath testing under the Implied Consent Act. *See* 7.33.2.3 NMAC (setting forth statutory authority for regulations).

**{9}** In 7.33.2.10 NMAC, SLD established criteria governing the initial certification, continuing responsibilities, recertification, denial, suspension, and revocation of certifications for the breath alcohol instruments used by law enforcement. Our Supreme Court has held that the party seeking admission of the BAT result need not show compliance with all SLD regulations, only those that are "accuracy-ensuring." *State v. Martinez*, 2007-NMSC-025, ¶ 11, 141 N.M. 713, 160 P.3d 894 (internal quotation marks and citation omitted). This foundational requirement can be satisfied through testimony that the instrument had a certification sticker issued by SLD on it when the test was run and need only be proven by a preponderance of the evidence. *Id.* ¶¶ 13-23.

**{10}** The Town proffered the machine's certification sticker, which was issued October 1, 2014, and expired on September 30, 2015, as evidence to prove the machine's certification. This satisfied the Town's burden to make a threshold showing that the machine

3

was certified and that the SLD certification was current at the time the test was taken. *See id.* ¶¶ 11-12.

## 1.    Radio Frequency Interference

**{11}**    Under the section titled "Continuing responsibilities," SLD provides a list of requirements for maintaining, testing, and locating instruments. 7.33.2.10(B) NMAC. While 7.33.2.10(B)(1) NMAC sets out an agency's obligation to maintain electronic records, analyze proficiency samples, check calibration, and have the machine inspected, 7.33.2.10(B)(2) NMAC dictates the appropriate environment for the operation of the machine. Under the portion of the regulation titled "Instrument location" agencies are required to furnish an "adequate operational environment" for instruments placed in a fixed location, 7.33.2.10(B)(2)(a) NMAC, including "adequate ventilation to minimize volatile organic compounds[,]" 7.33.2.10(B)(2)(b)(i) NMAC, "restrict[ed] access to the instrument [limited] to only authorized personnel[,]" 7.33.2.10(B)(2)(b)(ii) NMAC, and evaluation "for radio frequency interference" (RFI). 7.33.2.10(B)(2)(b)(iii) NMAC.

**{12}**    Defendant argues that because no RFI report for the 2013 test could be located, there is no evidence that the RFI test was completed, and therefore no evidence of compliance with the regulation. At trial, the Town offered evidence that the machine was tested for RFI in October 2006 and received approval for its fixed location from SLD in November 2006. According to the logbook maintained by the Taos Police Department, the machine was moved in June 2013 when the Department moved to its new location. The logbook shows that an RFI test was conducted on the machine one year and five months before Defendant's breath test, on September 15, 2013, and again on May 31, 2015.

**{13}**    Nothing in the regulation specifies how frequently an RFI evaluation must be conducted or how it should be done. 7.33.2.10(B)(2)(b)(iii) NMAC. The Rule requires only that the instrument location be evaluated for RFI. Thus, to the extent that the Town provided evidence that an RFI test was conducted both prior to and following Defendant's BAT, it demonstrated compliance with the regulation for Defendant's test conducted on February 13, 2015.

**{14}**    Defendant also asserts that the logbook pages alone are insufficient to demonstrate compliance with the regulations because they do not reflect how many channels were tested or what the results of the tests were. Officer Travis Wilder testified, however, that the logbook would reflect any RFI problems during the test. Officer Wilder also testified that, while agencies were previously required to obtain approval from SLD for the location of the instrument and to submit RFI test information, the regulations were amended in 2010 to remove the reporting obligation for RFI test results and that when he tried to send the RFI test paperwork to SLD, it was rejected. Although Defendant offered evidence that the SLD instruction sheet for RFI testing continued to direct agencies to submit test results to SLD, that alone is insufficient to demonstrate an abuse of discretion.

4

## 2.    Simulator Solution

**{15}**    Defendant next claims that there is insufficient evidence to support a finding that the machine was properly calibrated and that the district court abused its discretion when it admitted and considered BAT results taken from an improperly calibrated machine. Defendant argues that the evidence presented at trial showed that the simulator solution used to calibrate the machine was not at the proper temperature when calibration was performed, rendering any subsequent testing unreliable. Defendant insists that the calibration check that uses the simulator solution is "accuracy ensuring" and that the district court's admission of the BAT results after calibration with a non-compliant solution was improper.

**{16}**    The operator checklist that accompanies the instrument provides that the simulator solution must be between 33.8 degrees and 34.2 degrees Celsius. During cross examination, defense counsel asked Officer Martinez if the temperature of the simulator solution was 34 degrees *Fahrenheit* when he administered the test to Defendant. Officer Martinez indicated that it was. During redirect, Officer Martinez further explained his testimony:

> Q:    . . . And then the temperature of the solution, how is that reflected when you administer the test?
>
> A:    You mean when we check it?
>
> Q:    Yes.
>
> A:    It's—there's a thermometer on the wet bath.
>
> Q:    And does it—what does the thermometer say? Is it a digital thermometer?
>
> A:    No, it is a regular thermometer, and there's the number 34 in the middle, and then several lines under it or above it.
>
> Q:    And what do you look at to determine whether the temperature is within an acceptable range?
>
> A:    If it's close—not close—but if it's within .2 of 34.
>
> Q:    Okay. And does it say on it whether it's Celsius or Fahrenheit?
>
> A:    Not that I recall.

**{17}**    Defendant argues that Officer Martinez's testimony that the simulator solution was 34 degrees Fahrenheit, rather than 34 degrees Celsius, as required by the operator checklist,

5

shows that the machine was not properly calibrated and renders any subsequent tests, including his, unreliable. Officer Martinez, however, testified that the thermometer on the wet bath simulator he used to calibrate the machine showed the target number of 34, with demarcations above and below the number to indicate temperatures above and below 34. Based on the evidence, it was reasonable for the district court to infer that the thermometer on the wet bath simulator measured degrees in Celsius, rather than Fahrenheit and, as Officer Martinez indicated, there was a thermometer that accompanied the wet bath simulator used to calibrate the machine. There was no indication that the simulator solution was cold to the touch, as it would be if it were 34 degrees Fahrenheit. To the extent that Officer Martinez's testimony creates a conflict in the evidence regarding the temperature of the simulator solution, the district court was free to resolve that conflict in reaching its decision. *See State v. Salas*, 1999-NMCA-099, ¶ 11, 127 N.M.686, 986 P.2d 482 ("[W]e defer to the fact finder for the factual determination of conflicting facts[.]"); *see also State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (stating that the fact-finder "is free to reject [the d]efendant's version of the facts").

**{18}** As explained above, the machine met the certification requirements, thereby satisfying the foundation standard for admissibility set forth in *Martinez*, 2007-NMSC-025, ¶ 12. The district court could properly conclude, based on the evidence, that the simulator solution was the proper temperature. The threshold showing of the machine's certification, together with the reasonable inference that the simulator solution was the correct temperature, leaves no indication that the machine was improperly calibrated or that the district court improperly considered the BAT results. We therefore need not reach Defendant's "accuracy ensuring" argument.

**{19}** To the extent that Defendant's argument attacks the reliability of the BAT results, it is unpersuasive. Any lack of clarity in Officer Martinez's testimony regarding the temperature of the simulator solution goes to the weight of that evidence. *See State v. Christmas*, 2002-NMCA-020, ¶ 12, 131 N.M. 591, 40 P.3d 1035 (concluding that "any discrepancy in regard to the validity of [the d]efendant's [BAT] results went to the weight of the evidence to be considered by the [fact-finder]"). Defendant points to nothing in the record to indicate how much weight the district court gave Officer Martinez's testimony regarding the simulator solution. "We presume that a judge is able to properly weigh the evidence, and thus the erroneous admission of evidence in a bench trial is harmless unless it appears that the judge must have relied upon the improper evidence in rendering a decision." *State v. Hernandez*, 1999-NMCA-105, ¶ 22, 127 N.M. 769, 987 P.2d 1156. As such, Officer Martinez's initial testimony that the temperature of the simulator solution was measured in Fahrenheit, without more, is insufficient to establish that the district court abused its discretion in light of his subsequent testimony.

**B.      Officer Martinez's Field Sobriety Test Testimony**

**{20}** Defendant also argues that the district court erred in considering Officer Martinez's testimony as expert testimony because he lacked adequate qualifications and because his

administration of the tests was not in accordance with recognized standards. Defendant therefore asserts that the district court should not have considered the results of the field sobriety tests that Officer Martinez administered.

## 1.     Proceedings

{21}     Before trial, Defendant sought to exclude the results of the HGN test and to limit Officer Martinez's testimony regarding the other two field sobriety tests. Defendant argued that testimony as to those tests consisted of both layman's testimony and testimony based on specialized knowledge under Rule 11-702 NMRA. Defense counsel stated, "we ask the [c]ourt . . . to consider the balance of the field sobriety tests[,] . . . how the officer was trained, what the officer instructed, and what the officer observed during the field sobriety tests, and leave it at that." Defense counsel further argued that Officer Martinez, being trained to perform the tests, could not lay the scientific foundation for the validity of the tests. The Town represented to the court that Officer Martinez would not be offering "any opinion as to impairment." The court suggested that Officer Martinez would not be presenting scientific evidence, but that he did possess specialized knowledge regarding field sobriety tests beyond that of the fact-finder. The court noted, "[H]e's an expert . . . if you're trying to extrapolate a BAC, then I could see how it would be—there would have to be some scientific basis for it. But he's an expert. He's more of an expert than I am, the finder of fact—the trier of fact." Defense counsel responded, "But the rule says scientific or other specialized knowledge. So, he does possess other specialized knowledge." The court ruled that Officer Martinez could testify that he had received training "about how you detect impairment based upon field sobriety tests, or what they are designed to detect." It also acknowledged that, while Officer Martinez could not testify regarding extrapolation of a BAC, he could testify to the results of the field sobriety tests: "I'm not saying that it would be enough to meet the burden. I'm just saying that I think I can consider it."

{22}     During trial, the Town presented evidence that Officer Martinez completed a thirty-two-hour training session that covered the administration of standardized field sobriety tests, and he participated in a wet lab, during which he administered field sobriety tests on intoxicated individuals in a controlled environment. Officer Martinez testified that the purpose of field sobriety tests is "to detect impairment."

{23}     Officer Martinez then testified that he administered three standardized field sobriety tests on Defendant. Officer Martinez first testified that he administered the HGN test, during which Defendant emitted a strong odor of alcohol, had bloodshot, watery eyes, and swayed in a circular motion. Officer Martinez did not testify as to the results of the HGN test or render an opinion on Defendant's performance of that test. Next, Officer Martinez administered a walk-and-turn test on Defendant. Officer Martinez testified that during that test, he observed Defendant step out of position to maintain his balance, fail to keep his arms by his sides, start the test prematurely, turn contrary to instructions, and take eleven steps instead of the nine he was instructed to take. Finally, Officer Martinez conducted the one-leg-stand test. Officer Martinez testified that he observed Defendant raise and lower his right

7

foot throughout the entire test in order to maintain balance, bend both legs throughout the entire test rather than keep them straight, and use his arms for balance. After giving Defendant all three tests, Officer Martinez took Defendant into custody. Officer Martinez never stated any opinion as to whether Defendant was intoxicated, nor did he draw a correlation between any perceived impairment and Defendant's BAC.

## 2. Standard

**{24}** We review the admission or exclusion of expert testimony for an abuse of discretion. *See State v. Torres*, 1999-NMSC-010, ¶ 27, 127 N.M. 20, 976 P.2d 20. However, we must first look to whether the district court properly decided to characterize Officer Martinez as a lay witness or as an expert witness. This "threshold question of whether the [district] court applied the correct evidentiary rule or standard is subject to de novo review on appeal." *Id.* ¶ 28. Officers trained in standardized field sobriety tests are non-scientific experts who "may, because of their training, experience, and specialized knowledge, testify as to the administration and specific results of the test[.]" *Id.* ¶ 47 (emphasis omitted). "[N]on-scientific testimony must be reliable to be admissible." *Quintana v. Acosta*, 2014-NMCA-015, ¶ 14, 316 P.3d 912. To determine the reliability of non-scientific expert testimony, "the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *Id.* (internal quotation marks and citation omitted). Contrary to Officer Martinez's testimony that the purpose of field sobriety tests is to "detect impairment," New Mexico courts have long recognized that standardized field sobriety tests are designed to "discriminate between drivers above and below the statutory BAC limit, not to measure driving impairment." *State v. Lasworth*, 2002-NMCA-029, ¶ 15, 131 N.M. 739, 42 P.3d 844 (emphasis omitted).

## 3. Officer Martinez's Testimony

**{25}** Defendant argues that the district court improperly qualified Officer Martinez as an expert based on specialized knowledge, citing statements the district court made before the Town had set forth any of his qualifications or laid any foundation for his testimony. Contrary to Defendant's assertion, the record reveals that rather than qualify Officer Martinez as an expert before he ever testified, the district court acknowledged that if Officer Martinez were to qualify as an expert, it would be because of his specialized knowledge of field sobriety tests. At no point during its direct examination of Officer Martinez did the Town tender him as an expert. Without an explicit tender and qualification of Officer Martinez as an expert, we must look to his testimony to determine whether it was based on his specialized knowledge, thereby requiring that the Town provide evidence of his adequate qualifications and proper administration of the tests.

**{26}** To the extent that Officer Martinez wrongly testified that field sobriety tests measure impairment, we presume that the district court disregarded that testimony. *State v. Hernandez*, 1999-NMCA-105, ¶ 22 ("We presume that a judge is able to properly weigh the evidence, and thus the erroneous admission of evidence in a bench trial is harmless unless

it appears that the judge must have relied upon the improper evidence in rendering a decision."). Aside from that testimony, the scope of Officer Martinez's testimony is very narrow—strictly limited to a recitation of what he said and did in administering the test, and his observations of Defendant's actions during the HGN, walk-and-turn, and one-leg-stand tests. This testimony fits firmly within the definition of lay testimony, which is limited to testimony that is "rationally based on the witness's perception," and "not based on scientific, technical, or other specialized knowledge." Rule 11-701(A), (C) NMRA; *see Torres*, 1999-NMSC-010, ¶ 31 (describing observations of field sobriety tests as "self-explanatory," noting that symptoms such as slurred speech or bloodshot eyes are "commonly understood signs of intoxication" (internal quotation marks and citation omitted)). The fact that Officer Martinez had training and experience in the administration and assessment of field sobriety tests does not automatically transform his testimony into an expert opinion, as his testimony was limited to observations that would be easily understood and interpreted by any lay witness present when Defendant performed the field sobriety tests.

**{27}** This case is analogous to our decision in *State v. Pickett*, 2009-NMCA-077, 146 N.M. 655, 213 P.3d 805. In *Pickett*, an officer observed the defendant driving in a dangerous manner, weaving in and out of traffic, and nearly colliding with another vehicle. *Id.* ¶ 3. After stopping the defendant, the officer detected an odor of alcohol on him, and the defendant had bloodshot, watery eyes. *Id.* The defendant admitted to having consumed alcohol prior to being stopped. *Id.* Just as in this case, the officer in *Pickett* testified that he gave three field sobriety tests—HGN, walk-and-turn, and one-leg-stand. *Id.* ¶ 4. The officer did not testify as to the results of the HGN test, but explained that defendant:

> sway[ed] and fail[ed] to keep his arms at his side as instructed during the one-leg-stand test and, during the walk-and-turn test, mov[ed] his foot to the side for balance, failing to touch heel to toe on several steps, holding his arms away from his side, and requesting that the instructions for the turn be repeated several times.

*Id.* ¶ 21. The officer referred to many of these observations as "clues." *Id.* ¶ 4 (internal quotation marks omitted). The defendant was convicted of DWI, and on appeal argued that the officer's testimony about the field sobriety tests was "lay testimony cloaked in scientific terminology." *Id.* ¶ 19 (internal quotation marks omitted). The defendant asserted the officer's testimony was impermissible because he testified beyond the scope of Rule 11-701 without having been qualified as an expert. *Pickett*, 2009-NMCA-077, ¶ 19. He further asserted that the officer's references to certain actions as "clues" went "beyond what a normal person would use to form an opinion on whether [he] was impaired by alcohol." *Id.* ¶ 20 (internal quotation marks and citation omitted).

**{28}** In *Pickett*, the district court acknowledged that the officer had testified to some information that a normal person would not be able to use in forming an opinion, but concluded that the officer's specific observations of the defendant's behavior might lead a normal person to believe a driver was intoxicated. *Id.* ¶ 21. This Court presumed that, even

9

if the officer's testimony regarding the number of "clues" the defendant exhibited during the test was improperly admitted, there was no indication that evidence was essential to the district court's ruling. *Id.* We therefore considered any error in the admission of the officer's testimony regarding "clues" to be harmless. *Id.*

**{29}** Here, Officer Martinez's testimony, like that of the officer in *Pickett*, was arguably comprised of both information "a normal person would not likely be qualified to use in forming an opinion" and that which is rationally based in the witness's perception and which a normal person would use to form an opinion as to whether Defendant was intoxicated. *Id.*; *see* Rule 11-701(A). There is no indication here that the district court used the information that was beyond a normal person's grasp in reaching its conclusion. Furthermore, Officer Martinez's testimony in this case, contrary to Defendant's assertions, did not rise to the level of the officer's testimony in *Pickett*. Officer Martinez made no references to "clues," drew no conclusions, and made no correlation between Defendant's performance on the field sobriety tests and his BAC.

**{30}** Because we conclude that Officer Martinez did not testify as an expert, we need not address Defendant's assertion that Officer Martinez lacked the qualifications necessary to be an expert witness. Defendant bemoans the lack of "testimony establishing the underlying scientific or technical reliability of field sobriety tests[.]" Such testimony is unnecessary where, as here, Officer Martinez acted solely as a fact witness, never summarizing his observations into a conclusion regarding Defendant's performance on the field sobriety tests or correlating Defendant's performance on the field sobriety tests with a BAC. As such, we find no merit in Defendant's contention that any reliance on Officer Martinez's observation of Defendant's performance on the field sobriety tests was "not supported by logic or the effect of the evidence."

### 4. Officer Martinez's Administration of Field Sobriety Tests

**{31}** In his brief, Defendant argues that Officer Martinez administered the field sobriety tests using "flawed" instructions. He asserts that any deviation from the standard instructions "compromised" the test. As a result, Defendant contends that the district court's "reliance on the field sobriety tests was not supported by logic or the effect of the evidence."

**{32}** Many of Defendant's assertions regarding the "flawed" administration of the tests are not supported by the record. For instance, Defendant suggests that it was improper for Officer Martinez to instruct Defendant to keep his "hands" at his sides when the official instructions require the subject to keep his "arms" at his sides. Defendant seeks here to create a distinction without a difference, as Officer Martinez demonstrated the test to Defendant, eliminating any confusion that could have arisen. Defendant also contends that he "was not given the benefit of being asked whether he understood Martinez's instructions, a question which is required by the proper instructions[.]" Again, this assertion is not supported by the record, as Officer Martinez testified that after instructing Defendant on the one-leg-stand test, he asked Defendant if he understood, to which Defendant responded, "Yes, sir." In

10

addition, Defendant describes Officer Martinez's explanation that Defendant should walk an imaginary line as "nonsensical," asserting that "no such instruction exists in Exhibit H[,]" the training materials for administration of field sobriety tests. To the contrary, Exhibit H states that for the walk-and-turn test, subjects are instructed to "[p]lace [their] left foot on the line (real or imaginary)" and then place their right foot "on the line ahead of the left foot[.]" Finally, Defendant asserts error in Officer Martinez's failure to ask whether Defendant suffered from any medical conditions that might affect his performance, yet points to nothing in the record and no authority to suggest such an inquiry was required. *See* Rule 12-318(A)(3) NMRA (requiring citations to the record proper); *see also Guest v. Berardinelli*, 2008-NMCA-144, ¶ 25, 145 N.M. 186, 195 P.3d 353 (declining to address contentions that lack citation to the record proper).

**{33}** As Defendant has not demonstrated that Officer Martinez failed to give proper instructions when administering the field sobriety tests, we hold that the district court did not commit error in considering and weighing them in its assessment of Defendant's guilt. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (acknowledging that there exists "a presumption of correctness in the district court's rulings" and that the defendant has the burden of demonstrating a claimed error (alterations, internal quotation marks, and citation omitted)). We next consider Defendant's argument that the evidence was insufficient to support his conviction.

## C.    Sufficiency of Evidence

**{34}** When reviewing for sufficiency, we view the evidence in the light most favorable to the verdict, and then determine "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Trossman*, 2009-NMSC-034, ¶ 16, 146 N.M. 462, 212 P.3d 350 (internal quotation marks and citation omitted). We "indulg[e] all reasonable inferences and resolv[e] all conflicts in the evidence in favor of the verdict." *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citation omitted). In reviewing for sufficiency, "[t]he reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *Id.* (internal quotation marks and citation omitted).

**{35}** Defendant argues that insufficient evidence exists to prove he was impaired while operating a motor vehicle. Circumstantial evidence alone may be sufficient to allow a fact-finder to infer that the accused drove while intoxicated. *See State v. Mailman*, 2010-NMSC-036, ¶¶ 24-28, 148 N.M. 702, 242 P.3d 269. Actual physical control of the vehicle "is not necessary to prove DWI unless there are no witnesses to the vehicle's motion and insufficient circumstantial evidence to infer that the accused actually drove while intoxicated." *Id.* ¶ 28 (emphasis omitted).

**{36}** In this case, the Town presented circumstantial evidence to prove its case. That evidence included testimony of two witnesses from the scene who testified to seeing

11

Defendant in the driver's side of the vehicle and operating the vehicle immediately after the initial crash and testimony that immediately after the crash Defendant looked like he had been drinking. There was also testimony that the police were summoned immediately after the crash and that Officer Martinez arrived four minutes after being dispatched to the scene. Officer Martinez testified that he detected a strong odor of alcohol on Defendant's breath and that Defendant admitted to Officer Martinez that he had consumed "a few beers." Officer Martinez also testified that during the field sobriety tests, Defendant swayed on the spot while standing, stepped out of position to maintain balance, used his arms for balance, and performed the tasks contrary to the instructions given. Defendant's BAC after a twenty-minute deprivation period was 0.12. This evidence is adequate to support a DWI conviction for past driving. *See id.* (explaining that circumstantial evidence could be sufficient to uphold a DWI conviction for past driving where it includes "the accused's own admissions, the location of the vehicle next to the highway, or any other similar evidence that tends to prove that the accused drove while intoxicated").

**{37}** Defendant analogizes this case to *State v. Cotton*, 2011-NMCA-096, 150 N.M. 583, 263 P.3d 925, because "the defendant could have parked . . . and then drank[.]" In *Cotton*, this Court reversed the defendant's conviction for aggravated DWI where the state provided no evidence at trial that the defendant actually drove while impaired. *Id.* ¶ 1. The defendant in that case was parked on the side of the road and was seated in the driver's seat with no keys in the ignition when the officer approached him. *Id.* ¶¶ 4-5. While the defendant admitted to having consumed alcohol one hour earlier and performed poorly on the field sobriety tests, indicating he was impaired at the time he came into contact with the officer, there was no evidence that the defendant drove while impaired and no indication of how long the vehicle had been parked in that location. *Id.* ¶ 14. Because there was nothing linking the defendant's impairment with any prior driving, we noted in *Cotton* that "[the d]efendant could have parked and then consumed the beer." *Id.* We concluded that the state had "failed to establish that [the d]efendant drove *after* he had consumed alcohol and after alcohol had impaired his ability to drive[.]" *Id.*

**{38}** In *Cotton*, there were no witnesses to the vehicle's motion, and there was insufficient circumstantial evidence to allow for an inference that the accused actually drove while intoxicated. *See Mailman*, 2010-NMSC-036, ¶ 28; *Cotton*, 2011-NMCA-096, ¶ 13. *Cotton* is therefore distinguishable. Rather than happening upon a parked car, without any idea of how long it had been there, Officer Martinez arrived four minutes after an accident. There was testimony from witnesses who saw Defendant driving. Defendant admitted to having consumed alcohol, still smelled of alcohol, and had a BAC of 0.12 approximately thirty to forty minutes after the crash. Such evidence is sufficient to allow for an inference that Defendant drove while intoxicated.

**{39}** Defendant also suggests that Defendant could have consumed alcohol between Officer Martinez's first and second encounters with Defendant. In making this assertion, Defendant argues that this case contains "evidence of drinking after physical control/driving ceased." Officer Martinez testified that less than ten minutes passed between his first and

second encounter with Defendant. During that time, Defendant was standing approximately fifteen feet behind his vehicle, Defendant did not have any alcohol on his person or take anything out of his pockets, and Officer Martinez never saw Defendant get back into his vehicle. The "evidence of drinking" to which Defendant refers appears to be Officer Martinez's concession that he could not "swear that [Defendant] wasn't" in his vehicle at any point between the two encounters and that Officer Martinez did not notice the smell of alcohol on Defendant's breath during his first encounter with Defendant. Officer Martinez testified, however, that during the first encounter, he was solely trying to secure the scene and check for injuries, and he did not get close to Defendant. "It is within the district court's purview, when acting as fact-finder, to weigh the credibility of witnesses and, in doing so, discard Defendant's version of events." *State v. Ortiz*, 2017-NMCA-006, ¶ 18, 387 P.3d 323. We decline Defendant's invitation to re-weigh this evidence on appeal and conclude that there was sufficient evidence to support Defendant's conviction for DWI based on past driving while impaired.

## III.    CONCLUSION

{40}    We affirm Defendant's conviction for driving under the influence.

{41}    **IT IS SO ORDERED.**

_____

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**HENRY M. BOHNHOFF, Judge**

13